May it please the Court, good morning. My name is Suzanne Lachalier and I'm here on behalf of Appellant Mr. Ruben David Amos. The District Court here effectively ruled that in a bank robbery, the guideline enhancement for physical restraint of a victim applies where the defendant has the ability to force a victim in any way. That is not. I didn't quite do that. Not in any way. Well the District Court. They looked at the facts of this case. The Court did. You know when I first read the briefs I kind of thought hmm this doesn't look like physical restraint and then I read the District Court's decision and you know it looks pretty close. It looks like it might be physical restraint. What the District Court, the District Court's standard effectively, they misapplied or misinterpreted what this Court has ruled is the standard and this Court has essentially found that there needs to be not simply that the victim was tied, bound or locked up as in the guideline, but that the, that there be some kind of sustained focus. And in defining sustained focus and specifically in Parker, the case that decided that issue, that question of sustained focus, this Court has always looked for sustained focus at gunpoint. And that's the concern here is the Court took, the District Court took this a step further and said the ability to force a victim in this case. Which of the cases does it have to be sustained focus with a gunpoint, at gunpoint? I would say it's an extension, it's derived from Thompson initially from this circuit and then Parker, Parker was after Thompson. Did we say that, did we say that it had to be sustained focus at gunpoint? Did we say sustained focus and in Parker it happened to be at gunpoint? That's correct, Your Honor. It happened to be at gunpoint in Parker, but I think what the Court, if I may, I think what the Court was concerned about in Parker is that there was gunpoint and it was sort of a momentary gunpoint where yelling instructions at an individual to get down. And the Court was concerned that gunpoint was becoming even broader than, than intended, meaning that it wasn't sustained enough. And so I, I would submit that what Parker sought to do was sort of define what, what gunpoint meant when no physical contact was present. I think that's where I'd want to step back to. If gunpoint is an element of that, why isn't that satisfied here by brandishing the gun in his waistband? Why, why is that not satisfied by brandishing? Why isn't that sufficient here? He has a gun in his waistband. It is completely visible to everybody there. He is threatened, according to the testimony of one of the tellers, he's threatened to kill them. He has, he has somebody else in the, in the bank holding everybody else while he's moving the tellers from one place to another to get money. Why isn't that sufficient to satisfy? Assuming that you're correct about the sustained focus at gunpoint, and I just want to focus at the at gunpoint, why isn't that sufficient to satisfy the at gunpoint element that you assert as part of our test? Because in, in Thompson, when this court found, essentially, effectively extended what the guideline refers to, and the guideline really refers to physical, in the true sense of the word, physical restraint, when Thompson sort of extended the application of the guideline, it's talked about a victim looking down the barrel of a gun. And so I would submit that simply holding it in, in one's waistband is not looking down the barrel of a gun, is not that kind of sustained threat of force, threat of physical force that Thompson was going to make. You're actually arguing for immediacy rather than sustained focus. See, that's, sustained focus is something different. That is that I've, that I've singled you out. I'm moving you here, I'm moving you there. I've, I've, I've done something to you. That would be sustained. You're arguing, it seems to me, at a different point, which would be immediacy. That is, I didn't have an immediate threat of the gun because he didn't have his finger on the trigger, it was stuck in his waistband. I suppose immediacy has some component to it. The immediate ability to, to use that force. Yes, I guess that's one of the concerns I have with the way the court, the district court interpreted the facts here, is that it said the ability at, at some point to force a victim is, is, is sufficient. And that's certainly not what the, the court, this court's interpretation of the case is, the facts that it's looked at before suggested. So I, I would say that, yes, immediately, immediacy is a component of it. But, but even, even more than that, I think that the, there's, there's a, the, the phys, I, I think, I, again, I would refer back to the guideline. Because the guideline really does require, or, or at least discuss the, the physical nature of it. I think that's why, I'm not sure I want to be locked into the idea of immediacy. Because I think what, what the concern is, is, is the, the threat of some real genuine physical danger. And I think that's why the guideline refers to being tied, bound, or locked up. And that's why, I believe, this court- Was there any doubt that the, that the tellers didn't under, didn't see the gun? No, I, under the, on the record, as it stands, there's no, there's no question that they, that the gun was visible from the window at all time. And they saw it. That's correct, Your Honor. Isn't there evidence that there was also physical force pushing one toward the vault and then pushing another employee into the vault? Yes, Your Honor. There was a, a shoving or pushing of, of one employee towards the vault and another to the floor in the vault. To, I would say those were sort of in, those incidents were, were sort of momentary physical contact. They were incidental to the bank robbery. For instance, if an individual was running out of the bank after committing the bank robbery, and they shoved somebody aside. But that isn't what this situation is. No, Your Honor. Pushing someone, actually pushing two different people into the vault, where then the door was shut, and he told them, if you come out, I'll kill you. Right, the door, right. Isn't the, isn't the asportation of, of people under those circumstances sufficient to support a kidnapping claim? No, the case law discussing kidnapping or abduction or the enhancement for that involves really crossing the plane outside the building. So, in, in that he never really left the building. Since he was inside the building, there's no question that he has moved these people and forced them to go from one place to another. That's, within, within the confines of the bank. Within the, within the bank. So, he's moved them from their teller stations over to the vault. And he's handled two of them. I, I wouldn't go so far as to say the record shows he handled them. I think, I, I, again, I, I, I think just shoving is not sufficient. It's physical contact. Well, he wasn't shoving them out of the way on his way out of the bank. No, but it's. He was forced to get to the ground. Right. And I, again, I'd say those, those acts are incidental to a bank robbery. And, and it, it, effectively the guideline would apply in almost every incident where the, where a defendant pushes someone towards a vault, which, which presumably they have to go towards in order to accomplish the bank robbery. How about just, how about when he pushes them into the vault? And on the facts of this record, he didn't. He. How did they get into the vault? They opened the vault for him under his instructions. So, so there wasn't any pushing into any. Did he tell them to get into the vault, to, to walk to enter the vault? It's not clear from the record. I guess it can be read into the record that that's the case. I don't know that that's clear from the record, Your Honor. But I would, I would. Did you tell him to get down on the floor inside the vault? He verbally told him to get down on the floor and pushed one employee. Onto the floor. Onto the floor after the money had been removed. And then after he gets the money, he exits the vault and he closes the door. Right. Not locks. There's a lock, but does he shut it tight? That wasn't clear. There were, from the record, again, there was conflict. I think the, the court, the district court assumed that it was shut, yes. But there was conflicting testimony from the employees. And then he dashes out the building. And then he left. Out the bank. That's correct, sir. And I would ask the Court to look at, to look at what the guideline refers to as defining physical restraint again, because those words, tied, bound or locked up, really imply some physical contact. And I recognize that the use of a gun has been extended, and that's quite understandable. But truly, the cases require the true use of a gun. And I'd point out the Court, and I'd like to add to supplement the record later, in reading amendments to the guidelines recently, in 2006 amendments, oddly enough, the physical restraint came up in the context of 2L1.1 and alien smuggling. And the most recent amendment to that guideline, the Commission wanted to add, or to, to, the guideline to reflect an enhancement for the involuntary, for where a victim is involuntary detained through coercion or threat or in connection with the demand for payment. And the Commission reasoned that the restraint of victim guideline is the physical, involves physical restraint as defined in 1B1.1, and is more restrictive than they were looking to have it be under this guideline, which would have addressed involuntary detention through coercion or threat. And so, in fact, what happened was the Commission decided that under 2L1.1, they would need to create a new enhancement under that guideline to reflect this sort of lesser detention concept as a basis for enhancement. So, really, the Commission most recently has told us that 1B1.1 does not, does not cover anything but physical restraint of some kind, and physical restraint, as that Court has interpreted here, as that Court has interpreted. Should we defer the presumptive sentencing arguments and reasonableness pending Claiborne-Rita? Yes, Your Honor. That was my understanding, both from the Court's order and my expectation was that the Court's order just preceded my submitting a 28-J on the same issue. Yes, Your Honor. If I'd like to reserve the balance of my time if I may. Good morning. May it please the Court, my name is Ann Voights, and I represent the government. I'd like to address, first if I might, some of the factual questions that the panel raised, specifically with respect to what the defendant said when he was pushing the tellers, pushing one of the tellers and escorting the others to the vault. He said to them that he wanted to go to the vault, and he told them to hurry up. He did so, as it was claimed, with the BB gun visibly displayed in his waistband, he pushed one on the way to the vault. When in the vault, he then had one teller put money into the bag while the other two were pushed to the ground. And at that point, he then, once the bag was completely full of money, he then ordered the third teller to get to the ground and shoved him down, and then threatened them with death and left, shutting the door. And the facts are undisputed that the door was shut. That's my understanding from the PSR, that they said the door was closed and there's no evidence that the door was shut. And there's no evidence that it was locked. Your Honor, I believe under the case law, it was not locked. But under the case law, I believe that that's irrelevant. The fact is that it was shut. Well, we're talking about what are the facts now. Certainly. Your Honor, that is correct. There's no evidence that it was locked or that they believed that it was locked, that it was shut, and they were told that they would be killed if they left. And so, in fact, they remained on the ground, I believe, until the defendant left the bank. And it was only after that that they exited the vault. How did they know he was gone? I believe, looking at the PSR, they may have waited until they may actually have waited until they just said that they stayed in the vault until they felt it was safe to come out. It's unclear from the record what prompted them to believe that it was safe. Is the fact that the BB gun was, well, the gun, we don't forget the BB, but the fact that the gun was visible, is that critical to your, to the district court's application of this? I think when you look at the Court's ruling, you know, there was a factual dispute over whether the gun was, in fact, pointed. There was one statement that was taken about three years later. But the Court assumed that. Discounted that. Correct. The Court discounted that and assumed that it was not. And so it said that the fact that the gun was visible, it did rely on that in saying that that and the threats that were issued to the employees were what sort of coerced them into movement and coerced them into staying into the vault. So the district court did rely on that fact. I mean, what the district court did was it considered, it looked at the fact and it said that there was a sufficient sustained focus on the three employees. Right. Getting them to the vault. Correct. That they were moved. This wasn't a case where it was simply everyone in the bank get down on the floor. You know, this was a case where they were moved from the teller into the vault. And while the record isn't clear as to how long that took or what the distance was, it was moving them into a separate isolated room. How many of the people were in the bank at the time? Again, I don't believe the record is clear on that. Do we have other employees in the bank? I believe there may have been. Do we know whether there were customers in the bank? Again, I don't know that that's clear from the record. I guess my question is, well, from what I was getting at was, you know, if he just ordered them, directed them, the three tellers to the vault, told them to get inside, fill up the bag of money, got them down to the ground, shoved them or whatever, however, got them on the ground, slammed the door and left. Is that physical restraint? You get the gun. No gun. Okay. Leaving the gun out of that, I think that becomes a closer case. I do think you still have the key element of forcing someone against their will, assuming in your hypothetical that you also have the threats. Yeah. Forcing them against their will to go someplace. They can't see the gun, but he just says, you know, get to the vault or else you're going to beat me or something. Right. And shutting them in the vault. I think that does take it out of the sort of ordinary case of bank robbery where you're telling everyone to get down. It's isolating people. It's moving them someplace against their will through threats. Admittedly, I do think it is a closer case, but it's not one that's inconsistent with the case law on this point. And I'd like to note that under the focus cases, as was pointed out earlier, there's no case requiring that it be actually at gunpoint. And we think here the fact that the gun was visibly displayed was sufficient to make the threat very clear and to give some additional substantiation to the threats that the defendant made. The gun plays, in most of our case law, the gun plays a predominant role. It does. Although in some cases, I would note, I would agree that in the majority of cases it is said to be at gunpoint, although there are some cases where it's unclear whether the gun is simply displayed or actually pointed at the victims. But in this case, the gun was visible, and it was certainly played a part both in the district court's ruling and in the reason why this court should affirm the sentence. If there are no further questions. What about the sentencing question? Do you agree that that needs to be held? This Court certainly can. We think, as we stated in our briefs, we do think that despite the language the district court used about departures, that it was in fact not treating guidelines as presumptive. Nevertheless, if this Court believes that it's helpful, it certainly can. I think it's still open, given at least what the oral argument was in Zavala-Cardi and the issues that were to be addressed, which now has been stayed pending Claiborne-Reeda, that whether downward departures is a concept that still is extant given the reasonableness review and the 3553 factors. So it's the Court's prerogative to do that, if it thinks it's appropriate. And what's the sentence here? The sentence in this case refer to my notes for one moment. The defendant is sentenced to 61 months. And how long has he been serving? He was sentenced on November 21st of 2005. And I believe he was indicted in 2004. I don't know how long he was. Well, we should have Claiborne-Reeda by the end of June, July. So, okay. Thank you very much. Thank you. The government emphasizes that Mr. Amos ordered the victims to the vault and shouted hurry up. I would submit that those facts are incidental to any bank robbery, and that if those facts, along with the presence of a weapon, are sufficient in an armed bank robbery to apply physical restraint, then physical restraint is likely to apply in every armed bank robbery. By definition, there's going to be a weapon. And the guideline, the offense level, base offense level of 20, which the guideline itself recognizes as a relatively high base offense level, encompasses that, the presence of the weapon. So the mere presence of that weapon in the waistband is not enough. And under this Court's reading of the guideline in Thompson, certainly it's implied at least that the use of the weapon and staring and requiring the victims to stare at the weapon is necessary to imply that kind of force that the guideline was envisioning to address. And I would refer the Court to the record, to the excerpts of record at page 20, where the district court really disregarded whether or not the weapon was present and said that just the ability to force a victim to obey one's commands was sufficient. And that is an extension of this Circuit's case law in this area. Thank you. All right. Thank you very much, counsel. United States v. Amos will be submitted, and we will take up Bateman v. McGrath. Thank you.
judges: Wardlaw, Paez, Bybee